# United States Court of Appeals
## For the First Circuit

No. 25-1160

ANDREA BECKWITH; EAST COAST SCHOOL OF SAFETY; NANCY COSHOW;
JAMES WHITE; J. WHITE GUNSMITHING; ADAM HENDSBEE; THOMAS COLE;
TLC GUNSMITHING AND ARMORY; A&G SHOOTING,

Plaintiffs, Appellees,

v.

AARON M. FREY, in their personal capacity and in their official
capacity as Attorney General of Maine,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

Before

Montecalvo, Thompson, and Aframe,
Circuit Judges.

Christopher C. Taub, Chief Deputy Attorney General, Office
of the Maine Attorney General, with whom Aaron M. Frey, Attorney
General, Thomas A. Knowlton, Deputy Attorney General, Chief,
Litigation Division, and Paul Suitter, Assistant Attorney General,
were on brief, for appellant.

Caroline S. Van Zile, Solicitor General, Brian L. Schwalb,
Attorney General, Ashwin P. Phatak, Principal Deputy Solicitor
General, Anne A. Deng, Assistant Attorney General, Office of the
Attorney General for the District of Columbia, Rob Bonta, Attorney
General of California, Philip Weiser, Attorney General of
Colorado, William Tong, Attorney General of Connecticut, Kathleen
Jennings, Attorney General of Delaware, Anne E. Lopez, Attorney

General of Hawaii, Kwame Raoul, Attorney General of Illinois, Anthony G. Brown, Attorney General of Maryland, Andrea J. Campbell, Attorney General of Massachusetts, Dana Nessel, Attorney General of Michigan, Keith Ellison, Attorney General of Minnesota, Aaron D. Ford, Attorney General of Nevada, Matthew J. Platkin, Attorney General of New Jersey, Raúl Torrez, Attorney General of New Mexico, Letitia James, Attorney General of New York, Dan Rayfield, Attorney General of Oregon, Peter F. Neronha, Attorney General of Rhode Island, Charity R. Clark, Attorney General of Vermont, and Nicholas W. Brown, Attorney General of Washington, on brief as amici curiae supporting appellant.

Julia B. MacDonald, Pierce Atwood LLP, Douglas N. Letter, Shira Lauren Feldman, Tess M. Fardon, and Brady Center to Prevent Gun Violence, Esther Sanchez-Gomez, William T. Clark, and Giffords Law Center to Prevent Gun Violence on brief for Maine Gun Safety Coalition, Maine Coalition to End Domestic Violence, Maine Association of Psychiatric Physicians, Brady Center to Prevent Gun Violence, and Giffords Law Center to Prevent Gun Violence, as amici curiae supporting appellant.

Erik P. Fredericksen, Janet Carter, William J. Taylor, Jr., and Everytown Law, on brief for Everytown for Gun Safety, as amicus curiae supporting appellant.

Erin E. Murphy, with whom Paul D. Clement, Matthew D. Rowen, Kevin Wynosky, and Clement & Murphy, PLLC, were on brief, for appellees.

Erin M. Erhardt and Joseph G.S. Greenlee, on brief for the National Rifle Association of America - Institute for Legislative Action, as amicus curiae supporting appellees.

Christian B. Corrigan, Solicitor General, Peter M. Torstensen, Jr., Deputy Solicitor General, Montana Department of Justice, Austin Knudsen, Montana Attorney General, Counsel for the State of Montana, Steve Marshall, Attorney General of Alabama, Treg Taylor, Attorney General of Alaska, Tim Griffin, Attorney General of Arkansas, James Uthmeier, Attorney General of Florida, Christopher M. Carr, Attorney General of Georgia, Raúl R. Labrador, Attorney General of Idaho, Theodore E. Rokita, Attorney General of Indiana, Brenna Bird, Attorney General of Iowa, Kris Kobach, Attorney General of Kansas, Russell Coleman, Attorney General of Kentucky, Liz Murrill, Attorney General of Louisiana, Andrew Bailey, Attorney General of Missouri, Lynn Fitch, Attorney General of Mississippi, Attorney General of Missouri, Michael T. Hilgers, Attorney General of Nebraska, John M. Formella, Attorney General of New Hampshire, Drew H. Wrigley, Attorney General of North Dakota, Dave Yost, Attorney General of Ohio, Gentner F. Drummond, Attorney General of Oklahoma, Alan Wilson, Attorney General of

South Carolina, Marty J. Jackley, Attorney General of South Dakota, Jonathan Skrmetti, Attorney General and Reporter of Tennessee, Ken Paxton, Attorney General of Texas, Derek Brown, Attorney General of Utah, Jason Miyares, Attorney General of Virginia, John B. McCuskey, Attorney General of West Virginia, Ryan Schelhaas, Interim Attorney General of Wyoming, Warren Peterson, President of the Arizona Senate, and Steve Montenegro, Speaker of the Arizona House of Representatives, on brief as amici curiae supporting appellees.

April 3, 2026

**AFRAME**, **Circuit Judge**. This is an appeal of a preliminary injunction enjoining Maine's Attorney General from enforcing a law that, in many circumstances, imposes a seventy-two-hour waiting period before a seller may deliver a firearm to its purchaser. The statute, Me. Stat. tit. 25, § 2016 (2024) ("the Act"), was enacted approximately six months after an October 2023 mass shooting in the city of Lewiston, Maine, during which eighteen people were killed and thirteen others were injured. The impetus for enacting this statutory "cooling off" period was to decrease suicides and homicides carried out after impulsive firearm purchases. The Act, which took effect on August 9, 2024, was one of several firearms regulations that Maine adopted after the Lewiston shooting.

Several individuals and businesses sued the Maine Attorney General under 42 U.S.C. § 1983, alleging that the Act violates the Second Amendment rights of firearms purchasers, both facially and as applied.[1] Plaintiffs sought a preliminary

---

[1] Plaintiffs are Andrea Beckwith, who owns the plaintiff East Coast School of Safety ("ECSS"), an organization that specializes in providing firearms classes and self-defense training to victims of domestic violence; Nancy Coshow, who sought to acquire a handgun for self-defense purposes and passed an immediate background check but was unable to complete the acquisition for seventy two hours because of the Act; James White, who owns the plaintiff J. White Gunsmithing, a federally licensed firearms dealer; Adam Hendsbee, who owns the plaintiff A&G Shooting, a federally licensed firearms dealer; and Thomas Cole, who owns the plaintiff TLC Gunsmithing & Armory, a federally

injunction on their facial claim. See Fed. R. Civ. P. 65(a). The district court granted the request after it concluded that plaintiffs are likely to prevail on the merits of their claim and that the other preliminary injunction factors also favor awarding temporary relief. The Attorney General appeals. See 28 U.S.C. § 1292(a)(1). For the following reasons, we think that the Act is likely constitutional. Accordingly, we vacate the preliminary injunction and remand for further proceedings. See New Comm Wireless Servs. v. Sprintcom, Inc., 287 F.3d 1, 13-14 (1st Cir. 2002) (vacating a preliminary injunction because the movant did not establish a likelihood of success on the merits and noting that, in such a case, the remaining preliminary injunction factors become irrelevant).

**I.**

We start with an overview of the challenged statute. The Act's central provision states: "Waiting Period. A seller may

---

licensed firearms dealer specializing in selling firearms at weekend gun shows. Plaintiffs attached declarations to their complaint alleging that the Act has harmed them, their businesses, and their customers in various ways, including by interfering with the ECSS's practice of helping women facing credible, imminent threats of violence to immediately arm themselves for self-defense; by making Nancy Coshow twice, within a three-day span, drive eighty miles to purchase and subsequently take delivery of a handgun despite her already being a well-trained and responsible gun owner who immediately passed a background check; by denying immediate deliveries to otherwise eligible customers who claimed an immediate need for a firearm; and by causing the dealership plaintiffs to experience significant business loss.

not knowingly deliver a firearm to a buyer pursuant to an agreement sooner than 72 hours after the agreement. The 72-hour waiting period must be concurrent with any waiting period imposed by any background check process required by federal or state law." Me. Stat. tit. 25, § 2016(2) (bolded font omitted). Thus, the Act directly regulates sellers of firearms, not purchasers. It makes a violation of the Act a civil infraction for which a fine of not less than $200 and not more than $500 may be imposed. Id. § 2016(3)(A). Subsequent violations are also civil infractions for which fines of not less than $500 and not more than $1,000 may be imposed. Id. § 2016(3)(B).

The Act does not apply to the sale of a firearm if the seller knows that the purchaser is a law enforcement officer; a corrections officer; a person employed by a contract security company or proprietary security organization; a licensed private security guard; or a firearms dealer. Id. § 2016(4)(A), (B). Nor does it apply if the buyer and seller are family members; the transaction is between collectors for a firearm that is a curio or relic; the firearm is an antique; or the sale is one for which a background check is not required under federal or state law. Id. § 2016(4)(C). Furthermore, per an advisory jointly issued by the Maine Department of Public Safety and the Maine Office of the Attorney General before the Act took effect, the Act does not apply to a temporary loan or rental of a firearm. See Me. Dep't of Pub.

- 6 -

Safety & Me. Off. of the Att'y Gen., <u>Advisory on 72 Hour Waiting Period</u> 3 (2024).

The Act's legislative history demonstrates its intention to reduce suicides and homicides following impulsive firearm purchases. Several legislators supporting the Act pointed to an American Academy of Pediatrics ("AAP") report stating that waiting-period laws governing firearm purchases reduce suicide and homicide rates. The report notes that states with such laws have had fifty-one percent fewer firearm suicides than other states, and that states adopting such laws have seen a seventeen percent decrease in firearm homicides. The report posits that, nationally, over nine hundred firearm homicides could be prevented each year by every state implementing a waiting period. Several legislators also cited a second study which concluded that states adopting waiting periods saw a seventeen percent decrease in firearm homicides and a seven-to-eleven percent decrease in firearm suicides.

A representative of the AAP submitted testimony that around ninety percent of Maine firearm deaths are suicides and that, in 2021, fifty-six percent of all suicides involved the use of a firearm A representative of the Maine Medical Association and Maine Osteopathic Association submitted testimony that, in 2020, firearms became the leading cause of death among Maine residents aged one to nineteen. A representative of the Maine

Coalition to End Domestic Violence ("the Coalition") also submitted a statement that domestic violence advocates advise victims not to obtain a firearm as part of their safety plans because, statistically, victims are more likely to have the firearm used against them than to make helpful use of it during a confrontation. The Coalition's representative also opined that victims who believe firearms are necessary for their immediate safety would not be harmed by the Act because the Coalition offers services designed to keep victims safe during the seventy-two-hour waiting period.

The Maine Association of Psychiatric Physicians also submitted testimony in support of the Act. It cited a study finding that seventy percent of people who survive serious suicide attempts report that less than one hour elapsed between when they thought of suicide and when they attempted it. In addition, the Act's legislative record contains a February 2023 report from the Maine Center for Disease Control and Prevention observing that, in 2021, Maine experienced 178 deaths by firearms, of which 158 were suicides.

## II.

On November 12, 2024, plaintiffs filed this lawsuit and simultaneously moved for a preliminary injunction. The Attorney General opposed the motion and submitted declarations from three expert witnesses containing, inter alia, summaries of the history

of American firearms regulation and descriptions of empirical evidence that waiting-period laws reduce suicides and homicides. Plaintiffs did not contest this evidence. In February 2025, following briefing and oral argument, the district court issued an order enjoining enforcement of the Act.

The district court applied the de facto two-step test that the Supreme Court prescribed in N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 24 (2022), to evaluate the constitutionality of laws alleged to infringe the Second Amendment. That test requires, first, that a court determine whether the Second Amendment's "plain text covers an individual's conduct." Id. at 17. If so, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. If not, "the regulated conduct is categorically unprotected." Id. at 18 (quoting United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012)). The Bruen Court indicated, however, that "categorically unprotected" does not mean immune entirely from Second Amendment scrutiny. Laws that regulate conduct that is outside the Second Amendment's plain text but nevertheless burden a person's right to keep and bear arms are only presumptively constitutional; such laws may still violate the Second Amendment if the regulated party shows that the laws are being "put toward abusive ends." Id. at 38 n.9 (indicating that, while "shall-issue" licensing regimes

- 9 -

under which "a general desire for self-defense is sufficient to obtain a [concealed carry] permit" are presumptively constitutional, their constitutionality would be doubtful if accompanied by, for example, "lengthy wait times in processing license applications or exorbitant fees [that] deny ordinary citizens their right to public carry" (citation modified)).

Applying Bruen, the district court first concluded that, at step one, the Second Amendment's "plain text" covers the conduct regulated by the Act which it characterized as "the act of purchasing or acquiring a firearm." This conclusion led the court to proceed to step two, for, as Bruen states, "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" Id. at 17 (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 n.10 (1961)); see also Capen v. Campbell, 134 F.4th 660, 665 (1st Cir. 2025) (recognizing the applicability of Bruen's two-step test to firearms regulations). The Second Amendment's unqualified command is, of course, that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

At step two, the district court determined that the Attorney General had not shown that the Act is "'relevantly similar' to laws that our tradition is understood to permit . . . ." United States v. Rahimi, 602 U.S. 680, 692 (2024)

- 10 -

(quoting Bruen, 597 U.S. at 29). The Attorney General had argued, inter alia, that the Act resembled (1) laws requiring background checks or licenses, which often engender delivery delays; and (2) laws restricting firearm use by intoxicated individuals, which seek to temporarily disarm persons who may be experiencing short-term lapses in judgment. The court rejected these comparators, principally because, unlike the Act, they involve individualized consideration by regulators of objective criteria. The court thus concluded that plaintiffs were likely to succeed on the merits of their facial Second Amendment challenge. The court also concluded that plaintiffs were suffering irreparable injury and that the balance of equities and public interest favored issuing a preliminary injunction.

## III.

On appeal, the Attorney General contends that the district court erred both in reaching step two of the Bruen test and in the way that it applied step two's historical analogue analysis. These arguments raise questions of law that we review de novo. See, e.g., Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 11 (1st Cir. 2008) (stating that, under the abuse-of-discretion standard applicable to the review of a preliminary injunction, questions of law are reviewed de novo). As we explain below, we agree with the Attorney General that the Act's constitutionality can be addressed at step one of Bruen and that

- 11 -

the Act is likely constitutional.  We therefore do not consider whether the court erroneously conducted the historical analogue analysis.

As a reminder, step one of <u>Bruen</u> asks us to decide whether the Act curtails conduct covered by the Second Amendment's "plain text," <u>Bruen</u>, 597 U.S. at 17, which states that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  Therefore, we must decide whether, by imposing a seventy-two-hour waiting period for the delivery of a purchased firearm, the Act "infringe[s]" the textual "right of the people to keep and bear Arms . . . ." U.S. Const. amend. II.

To support the threshold contention that the district court should have stopped at step one of <u>Bruen</u>, the Attorney General argues that the Act does not curtail conduct covered by the Second Amendment's plain text and therefore presumptively does not violate the Amendment.  He contends the Amendment literally "says nothing about any right to purchase or otherwise acquire arms, much less to do so immediately."  Thus, he says the Act does not infringe the right to "keep" and "bear" arms because purchasing and acquiring firearms are materially distinct from, and necessarily antecedent to, possessing and carrying them.  This conclusion follows, he says, from the fact that the Act does no more than impose a condition on the commercial sale of firearms -- a category of regulation that the Supreme Court has

- 12 -

called "presumptively lawful." District of Columbia v. Heller, 554 U.S. 570, 626-27, 627 n.26 (2008) (stating that nothing in the Court's opinion should "cast doubt" on laws imposing such conditions).

Repeating their successful argument below, plaintiffs respond that the Act curtails conduct covered by the textual right because it interferes with "the act of purchasing or acquiring a firearm," which is a necessary precursor to keeping or bearing firearms. Plaintiffs point to Heller's statements that "the most natural reading of 'keep Arms' . . . is to 'have weapons,'" and that "the natural meaning of 'bear arms' . . . implies [] the carrying of [a] weapon [] for the purpose of 'offensive or defensive action.'" 554 U.S. at 582-84.[2] From these statements, plaintiffs contend that any law restricting a person's ability to keep and bear firearms for any length of time satisfies Bruen's step one requirement and therefore is lawful only if justified by

_____

[2] Plaintiffs also argue that, historically, the verb "to keep" embraced "taking possession as well as maintaining it." To support this proposition, they quote a sentence from an unnamed Founding-era treatise stating that one is "deprived by the law of keeping arms for his own defence if the law forbids the purchase of [them]." They also point to a statement in Andrews v. State, 50 Tenn. 165 (1871), opining that "the right of keeping arms necessarily involves the right to purchase and use them." Id. at 178 (citation modified). It strikes us, however, that both quoted statements assert nothing more than the common-sense proposition that the deprivation of the right to acquire firearms would interfere with the right to keep them.

reference to an historical analogue at step two.  In this regard, plaintiffs contend that

> [among them are] people who would like to take possession of firearms ("Arms") to have ("keep") and carry ("bear"), and [the Act] precludes them from doing so for three days. It also precludes Plaintiffs who would sell firearms to those who want to keep and bear them from doing so for three days.  That suffices to satisfy the threshold inquiry.  A law that restricts the ability to bear or keep a firearm unquestionably implicates Second Amendment rights, especially when, as here, it does nothing else.  (citation modified).

The four modern Supreme Court cases interpreting the Second Amendment do not provide clear guidance for resolving this dispute because none of them deal with the sort of regulatory regime we consider here.  Rather, the cases all involve direct prohibitions on the keeping or bearing of arms that squarely implicate the Second Amendment's plain text.  See Rahimi, 602 U.S. at 684-86 (involving the constitutionality of 18 U.S.C. § 922(g)(8), which in many circumstances prohibits an individual subject to a domestic violence restraining order from possessing ("keeping") a firearm); Bruen, 597 U.S. at 10-15 (involving the constitutionality of a New York regulatory regime that prohibited carrying ("bearing") a firearm outside the home for purposes of self-defense unless one convinced state licensing authorities that there was "special need" to permit public carry); McDonald v. City of Chicago, 561 U.S. 742, 749-52 (2010) (involving

the constitutionality of municipal laws that prohibited the possession ("keeping") of most handguns in the home for self-defense); Heller, 554 U.S. at 573 (involving the constitutionality of a District of Columbia law that prohibited the possession ("keeping") of usable handguns in the home).[3] Given the paucity of on-point Supreme Court authority, it is unsurprising that lower court judges have divided on how to approach Second Amendment challenges to waiting-period laws and similar restrictions.[4] This Court has yet to consider such a challenge to a waiting-period law or similar regulation.

---

[3] Plaintiffs disagree that the regulatory regime challenged in Bruen directly prohibited the bearing of arms. They describe Bruen as involving a challenge to a law that "barred them from obtaining concealed carry permits, not from carrying handguns altogether." This framing artificially narrows the scope of the claim in Bruen. Realistically construed, the Bruen plaintiffs alleged that the entirety of New York's discretionary licensing regime, which criminalized the concealed carry of a firearm outside the home for self-defense absent a discretionary license, violated the core right of law-abiding citizens to bear arms for self-defense. See Bruen, 597 U.S. at 9-12 (noting that, under New York law, "possessing a loaded firearm outside one's home or place of business without a license is a felony punishable by up to 15 years in prison" (citations omitted)). After all, many people were unable to show the special need that the New York law required. Thus, the regime challenged in Bruen indefinitely deprived many law-abiding citizens of their right to bear arms.

[4] With respect to waiting periods, compare Ortega v. Grisham, 148 F.4th 1134, 1142-56 (10th Cir. 2025) (applying both steps of the Bruen analysis to hold likely unconstitutional a New Mexico law imposing a seven-day "cooling-off" period on most firearms deliveries following a purchase), with id. at 1156-61 (Matheson, J., dissenting) (arguing that New Mexico's law imposes a condition or qualification on the commercial sale of firearms

that, under Tenth Circuit precedent, need not be justified by an historical analogue), and Silvester v. Harris, 843 F.3d 816, 829-32 (9th Cir. 2016) (Thomas, C.J., concurring) (arguing that "the challenge to California's ten-day waiting period can be resolved at step one of our Second Amendment jurisprudence" because it is "presumptively lawful" under Heller), abrogated on other grounds by Baird v. Bonta, 84 F.4th 1036, 1043 (9th Cir. 2023)).

More generally, compare, e.g., Rhode v. Bonta, 145 F.4th 1090, 1106-1121 (9th Cir. 2025) (applying both steps of the Bruen analysis to hold unconstitutional a California law requiring firearms owners to complete a background check before each ammunition purchase), vacated and reh'g en banc granted, 159 F.4th 1170 (9th Cir. Dec. 1, 2025), and Yukutake v. Lopez, 130 F.4th 1077, 1080-1108 (9th Cir. 2025) (applying both steps of the Bruen analysis to hold unconstitutional Hawaii laws imposing permitting and inspection requirements on purchasers of firearms), vacated and reh'g en banc granted, 144 F.4th 1119 (9th Cir. July 28, 2025), and Rocky Mountain Gun Owners v. Polis, 121 F.4th 96, 128-43 (10th Cir. 2024) (McHugh, J., concurring) (applying both steps of the Bruen analysis to conclude that a Colorado law raising the age to purchase a firearm from eighteen to twenty-one is likely a presumptively lawful regulatory measure), with N.Y. State Firearms Ass'n v. James, 157 F.4th 232, 243-49 (2d Cir. 2025) (holding that New York laws requiring ammunition sellers to conduct background checks on prospective buyers, to pay a fee for each background check, and to register with the state police likely did not curtail conduct covered by the plain text of the Second Amendment because they regulated only ancillary conduct and did not meaningfully constrain the textual right to keep and bear arms), and id. at 249-51 (explicitly disagreeing with the Ninth Circuit's majority decision in Rhode, 145 F.4th at 1090), and United States v. Peterson, 161 F.4th 331, 337-42 (5th Cir. 2025) (holding that the federal law requiring registration of firearm suppressors did not curtail conduct covered by the plain text of the Second Amendment because the law creates a "shall-issue" licensing regime of the sort approved in Bruen that was not shown to have been put toward abusive ends), and Rocky Mountain Gun Owners, 121 F.4th at 117-28 (holding at Bruen step one that a Colorado law raising the age to purchase a firearm from eighteen to twenty one is likely lawful because it merely imposes conditions and qualifications on the commercial sale of firearms), and Rhode, 145 F.4th at 1121-30 (Bybee, J., dissenting) (arguing that the California law requiring a background check before every firearm purchase was constitutional because it burdened only the ancillary right to

- 16 -

We agree with the Attorney General's view that laws regulating the purchase or acquisition of firearms do not target conduct covered by the Second Amendment's "plain text." The Amendment's plain text guarantees an individual's ability to keep and bear arms, which means to have and carry guns. Heller, 554 U.S. at 582-84. The Act does not address this conduct. Rather, the Act imposes a limitation in some circumstances on when a person can acquire a firearm after the person purchased it. The Act thus regulates conduct that occurs before a person keeps or carries a gun. Accordingly, applying Bruen's plain text analysis, the Act imposes conditions and qualifications on the commercial sale of firearms that do not directly restrict the textual rights protected by the Second Amendment. This may well explain why the Supreme Court has categorized laws such as the Act, which place conditions on the commercial sale of firearms, as "presumptively lawful." Id. at 626-27, 627 n.26.[5] Based on this understanding of the

_____

acquire ammunition, did not meaningfully constrain the textual Second Amendment right, and created a "shall-issue" licensing regime whose presumptive lawfulness was unrebutted), and Yukutake, 130 F.4th at 1108-25 (Bea, J., dissenting) (arguing that the Hawaii laws imposing permitting and inspection requirements on purchasers of firearms were constitutional because, as facially neutral ancillary regulations that impose conditions on the acquisition of firearms, they did not regulate conduct covered by the plain text of the Second Amendment).

[5] Plaintiffs say that a law imposing conditions and qualifications on the commercial sales of firearms must be "longstanding" to fall within Heller's safe harbor, and that the

Second Amendment's scope and the Act's requirements, we conclude that the Act likely regulates conduct outside the Second Amendment's plain text, which under step one of Bruen means that the Act is constitutional unless plaintiffs demonstrate that the Act is abusive toward Second Amendment rights.

As explained earlier, plaintiffs dispute this analysis by arguing that the Act must trigger step two scrutiny under Bruen. Plaintiffs say we should not characterize the proposed course of conduct here as purchasing or otherwise acquiring arms immediately. Instead, they say we should recognize that the plain

_____

Act's cooling-off period does not qualify because such laws are of relatively recent vintage. Plaintiffs also argue that satisfying the Act's waiting-period requirement cannot be regarded as a "condition" (or "qualification") of sale because it is not something that one can take action to satisfy. Neither argument is persuasive.

The first argument is based on a misreading of Heller, which states in its entirety that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27. In this sentence, "longstanding" modifies "prohibitions on the possession of firearms by felons and the mentally ill," not "conditions and qualifications on the commercial sale of arms."

The second argument is based on an overly narrow understanding of that which can be described as a "condition." Accepting for the sake of argument plaintiffs' premise that a condition is something one must be able to take action to satisfy, we do not see why the act of successfully waiting for seventy-two hours before taking delivery of a purchased firearm does not qualify.

- 18 -

text of the Second Amendment encompasses their conduct and put the Attorney General to the burden of identifying an historical analogue for the Act.

Accepting plaintiffs' position would be inconsistent with the de facto two-step framework that <u>Bruen</u> adopted. The approach prescribed in <u>Bruen</u> implicitly recognizes that there is a category of laws that (1) does not directly regulate conduct covered by the Second Amendment's plain text but nevertheless burdens Second Amendment rights, and (2) is presumptively lawful without reference to an historical analogue.[6] If plaintiffs were correct that any law with a downstream restrictive effect of any magnitude on the Second Amendment right must be justified by an historical analogue, we think that <u>Bruen</u> would have prescribed a single-step analysis requiring that such laws be deemed unconstitutional unless so justified. After all, step one of <u>Bruen</u> would be superfluous if all laws burdening the right to keep and bear arms to any degree are presumed unconstitutional absent such an analogue.

Plaintiffs' argument also runs contrary to <u>Bruen</u>'s footnote nine, where the Court explained why its holding striking

---

[6]    If a law neither burdens nor infringes Second Amendment rights, the law would not be subject to a Second Amendment challenge in the first place.  Step one of <u>Bruen</u> must have a purpose beyond ferreting out incoherent claims.

- 19 -

down a discretionary law that could preclude a person from bearing arms indefinitely should not be understood "to suggest the unconstitutionality" of non-discretionary "shall-issue" public-carry licensing regimes. See Bruen, 597 U.S. at 38 n.9 (contrasting New York's unconstitutional "may-issue" regulatory regime with these "shall-issue" regimes because they "do not require applicants to show an atypical need for armed self-defense;" "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry;" and "contain only narrow, objective, and definite standards" to guide licensing officials (citation modified)). The Bruen Court conducted the full, two-step analysis for New York's "may-issue" law because it indefinitely denied concealed-carry licenses to law-abiding, responsible citizens who wished to exercise their right to public carry for self-defense but could not show a special need. See id. But the Bruen Court also indicated that the full two-step analysis did not apply to "shall-issue" laws because these laws delay, but do not deny, licenses while states ensure that guns are being carried by law-abiding and responsible citizens. See id. Instead, the Court said that these shall-issue laws were presumptively constitutional unless a challenger could show that they were abusive toward Second Amendment rights. See id.

The Act resembles the "shall-issue" licensing laws and is unlike the discretionary "may-issue" law at issue in <u>Bruen</u> in this vital respect. The Act briefly delays acquisitions of firearms from commercial dealers. But it does not prevent a law-abiding and responsible citizen from obtaining and then keeping or bearing a firearm after fulfilling the waiting period requirement. In our view, this likely renders the Act a burden on, but not an infringement of, the Second Amendment right to keep and bear arms. It also means that our analysis should not proceed past step one of <u>Bruen</u>.

Finally, we think that plaintiffs' argument does not square with how the Supreme Court treats direct and incidental burdens on fundamental rights in other contexts. See <u>Bruen</u>, 597 U.S. at 24 (aligning the Second Amendment inquiry "with how we protect other constitutional rights"). In these other contexts, the Court strictly scrutinizes laws that directly restrict the exercise of fundamental rights but often reviews more deferentially laws that only impose incidental burdens on the exercise of those rights. See Michael C. Dorf, <u>Incidental Burdens on Fundamental Rights</u>, 109 Harv. L. Rev. 1175, 1177-78, 1199-1233 (1996) (providing, inter alia, a descriptive account of the Court's approach to incidental burdens on fundamental rights and concluding that such burdens tend to receive heightened scrutiny only if they "substantially" burden the right in question); see

also <u>United States</u> v. <u>O'Brien</u>, 391 U.S. 367, 376-77 (1968) (upholding a law because there was a sufficient government interest that justified "incidental limitations on First Amendment freedoms").

Indeed, we understand step one of <u>Bruen</u> to be a translation of the traditional approach to direct and incidental burdens into the <u>Bruen</u> analysis, which eschews the interest-balancing and means-ends scrutiny used in other contexts in favor of examining text and history. See <u>Bruen</u>, 597 U.S. at 18-24. So conceived, step one of <u>Bruen</u> directs courts to treat as presumptively constitutional laws that are outside of the Second Amendment's text and only incidentally burden Second Amendment rights in much the same way that traditional analysis treats as presumptively constitutional laws with only incidental effects on fundamental rights. See <u>Luis</u> v. <u>United States</u>, 578 U.S. 5, 33 (2016) (Thomas, J., concurring in the judgment) ("For the most part, the Court's precedents hold that a generally applicable law placing only an incidental burden on a constitutional right does not violate that right.").

For the reasons discussed, we conclude that the Act does not regulate conduct protected by the plain text of the Second Amendment. The Act is, therefore, constitutional unless plaintiffs can show that it is abusive toward those seeking to exercise their Second Amendment rights. Plaintiffs make one

- 22 -

argument that it is. They contrast the Act with the "shall-issue" laws" discussed in <u>Bruen</u>'s footnote nine and emphasize that, unlike "shall-issue" regimes, the Act operates across the board and does not involve an individualized assessment under objective criteria of whether a firearm purchaser is law-abiding and responsible. Plaintiffs say that this broad inclusivity renders the Act abusive. We disagree.

The Act shares the same goal as "shall-issue" regimes: to diminish the likelihood that firearms will be kept and borne by irresponsible citizens who may harm themselves or others. "Shall-issue" regimes require everyone to fulfill a condition before exercising the Second Amendment right to bear arms, regardless of whether the condition is necessary in the individual case. The Act operates similarly, although it also contains a series of exceptions designed to reduce burdens on Second Amendment interests where the risks favoring a cooling-off period are diminished. Moreover, the Act authorizes only a modest delay in the acquisition of a firearm that is no longer than federal law already permits for the completion of a background check before someone may obtain a gun. 18 U.S.C. § 922(t)(1). We therefore view the Act's imposition of a brief waiting period as a non-abusive effort by Maine to address a documented problem arising from the immediate acquisition of firearms while remaining

sensitive to minimizing the Second Amendment burdens imposed by the Act.

## IV.

For the reasons stated, plaintiffs are unlikely to prevail on their claim that the Act is facially unconstitutional. Accordingly, we **vacate** the preliminary injunction enjoining the Act's enforcement and **remand** for further proceedings.

**So ordered**.